UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOSE MATEO GUERRA,

                Plaintiff,           Case No. 18-13143

v                                           Honorable Thomas L. Ludington

CORBIN HOLT, individually and in his official capacity
GIDEON PAETZ, individually and in his official capacity

                Defendant.
_____/

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT, DECLINING SUPPLEMENTAL JURISDICTION, DENYING AS MOOT MOTION TO EXCLUDE EXPERT WITNESS, AND DENYING AS MOOT MOTIONS IN LIMINE**

On October 9, 2018, Plaintiff Jose Mateo Guerra filed a complaint against Defendants Corbin Holt and Gideon Paetz. Compl., ECF No. 1.[1] Holt and Paetz are troopers with the Michigan State Police and Plaintiff claims that they used excessive force against him during a traffic stop on February 5, 2017. ECF No. 1 at 4. His complaint presents a single count brought under 42 U.S.C. §1983 claiming that Defendants violated the Fourth Amendment through use of excessive force and one state law claim of assault and battery during Plaintiff's arrest.

Defendants have filed a motion for summary judgment and a motion to exclude the testimony of Plaintiff's expert witness, Andrew J. Scott III. ECF Nos. 21, 23. The motion for summary judgment will be granted and the motion to exclude expert testimony will be denied as moot.

**I.**

---

[1] Plaintiff also included the Michigan State Police as a defendant, but subsequently stipulated to its dismissal as a defendant.

At the time of the arrest, Paetz had been an officer with the Michigan State Police for approximately six years. ECF No. 23-4 at PageID.282. He is five foot eleven inches tall and weighed approximately 175 pounds at the time of the incident. ECF No. 23-4 at PageID.290. Holt had been an officer with Michigan State Police for almost four years at the time. ECF No. 23-3 at PageID.255. The parties do not provide a physical description of Holt, but a review of the dashcam footage indicates that he is similar in height and weight to Paetz. Plaintiff is five foot nine inches and weighed approximately 175 pounds at the time of the incident. ECF No. 23-17 at PageID.405.

On February 5, 2017 Plaintiff was at his mother's house at 2401 North Center Road, Saginaw, Michigan. ECF No. 23-2 at PageID.192. Plaintiff claims that he was organizing the garage. *Id.* at PageID.208. No one was living in the house at the time because his mother was in the process of selling the house. Plaintiff was drinking beer and Bacardi rum. He left the house to go to the liquor store which is approximately a two-minute drive away. He purchased tobacco, a 24 ounce can of beer, and a half pint of Bacardi rum. *Id.* Plaintiff testified that he was "somewhere between sober and buzzed" at the time. *Id.* at PageID.211.

At approximately 2:00 a.m., Plaintiff left the liquor store. *Id.* at PageID.209. He came to a four-way stop and noticed Defendants in their patrol car directly across the intersection from him. He believed that Defendants would pull him over. Plaintiff testified during his deposition as follows:

> Q: [Y]our thought was they perceived you to be a white guy in a Mexican neighborhood?
>
> A: Yeah.
>
> Q: And so you could only be up to no good; is that what you're saying?
>
> A: I won't say only up to no good, but it, you know, probably got their curiosity going, you know.

*Id.*

To avoid Defendants, Plaintiff turned right at the four-way stop and then turned left at the next street. He then pulled into the driveway of a house he did not know, hoping that Defendants "were just going to pass by." *Id.*

Defendants did not pass by, but instead pulled up behind Plaintiff with their patrol lights on. *Id.* Plaintiff assumed that the officers were going to arrest him because he had an outstanding warrant for his arrest. *Id.* at PageID.212. Plaintiff remained in his car as Holt approached Plaintiff's window. Holt explained they had pulled Plaintiff over because Plaintiff did not use his turn signal when he turned into the driveway.[2] ECF No. 23-3 at PageID.235. Holt asked Plaintiff whether there were drugs or guns in the car to which Plaintiff responded that there were none. ECF No. 23-2 at PageID.211; ECF No. 23-3 at PageID.235. Plaintiff gave Holt his identification and Holt invited Plaintiff to step out of the car. Plaintiff stepped out of the car and Holt patted him down. ECF No. 23-2 at PageID.212. Holt then asked Plaintiff to stand in front of the patrol car. *Id.* Plaintiff gave Holt permission to search his vehicle and Holt searched the vehicle while Plaintiff stood in front of the patrol car. *Id.*

After Holt returned to the patrol car, Paetz informed him that Plaintiff had two outstanding warrants. ECF No. 23-3 at PageID.239. One was for a probation violation in Saginaw County. Plaintiff had violated his probation when he left the supportive assistance program "Teen Challenge" in December 2016. ECF No. 23-2 at PageID.197-198; ECF No. 23-19 at PageID.434. The other was for retail fraud in Ottawa County. *Id.* However, it was later determined that the Ottawa County warrant misidentified Plaintiff.

According to the dashcam video and Holt's testimony, Holt instructed Plaintiff to face the patrol car and place his hands behind his back. ECF No. 23-3 at PageID.240-241. Plaintiff

---

[2] Holt testified that failure to use a turn signal is a civil infraction. ECF No. 23-3 at PageID.237.

complied with Holt's request. *Id.* at PageID.241. However, Holt was unable to handcuff Plaintiff because Plaintiff had balled his hands into fists. *Id.* at PageID.242. Holt told Plaintiff, "Interlace your fingers. Nope." *Id.* at PageID.244. Holt testified that "I said interlace your fingers. Nope. Because he wasn't following my directions, he wasn't interlacing his fingers." *Id.*

Plaintiff claims that one or two days prior to the incident, he had cut his right index finger and right thumb while cutting frozen steaks. ECF No. 23-2 at PageID.210-211. The cut was between the second and third knuckle of his right index finger and near the tip of his right thumb. Plaintiff did not seek professional medical attention for the injury. Instead, he cleaned and bandaged the injury himself. Holt later stated in a police incident report that he noticed that Plaintiff's "right thumb and index finger had lacerations on them that were wrapped up in white athletic tape." ECF No. 23-5 at PageID.313.

Plaintiff told Holt that he had a cut on his finger. Holt said that he understood and, "I'm just going to do like that for a few seconds." ECF No. 23-3 at PageID.244. Holt testified:

> Q: And what were you doing at that point?
>
> A: So at that point I had finally got Mr. Guerra to unball his fists because they were balled up into fists, which is why my handcuffs have not even gotten out because his fists are like this, like side to side, so it's very difficult to handcuff him, so I finally got his fingers to open up and interlace. When I finally got him that's -- right when I did that it was going into the compliant finger locking technique. That is when he pulled away.
>
> Q: Okay, so he did interlace his fingers at some point and then he pulled away?
>
> A: They weren't even completely interlaced. I didn't even have an opportunity to get the handcuffs out or anything. It was probably a fraction of a half a second.
>
> Q: After he had interlaced his fingers, that's when he pulled his hands from -- out from front?
>
> A: Yeah, he had pulled his hands away from my -- I don't even know if his hands were even touching at that point. I had just -- at that point had just got them unballed.

> Q: And you said and I'm going to do that for a few seconds, what you were referencing to was interlocking the fingers?
>
> A: Yes.

*Id.*

Plaintiff claims that the injury to his hand caused him to jerk his hand away from Holt when he pulled his hands back. *Id.* at PageID.213. Plaintiff's deposition testimony provides:

> Q: Do you remember a trooper asking you to interlace your fingers?
>
> A: Yes.
>
> Q: Did you interlace your fingers?
>
> A: I couldn't.
>
> Q: Why couldn't you?
>
> A: Because of the bandages on my fingers.
>
> Q: Did you try to interlace your fingers?
>
> A: I can't recall if I did.

*Id.* at PageID.216. Plaintiff claims that Holt squeezed his right hand. *Id.* at PageID.213

> I remember when he just grabbed my hand, the one with the cuts on it, and when he squeezed that was -- and then like, you know, it's natural reaction when someone squeezes your hand and it hurts you're going to jerk, and that's what I did and that's how all this got going.

Plaintiff then pulled his hand from behind his back.

> Q: Do you remember pulling your right hand from behind your body to the front of your body?
>
> A: Probably from the pain, yeah, that's when I jerked.
>
> Q: I want to be clear though. I'm asking if you remember that. Do you remember doing that?
>
> A: Yes.

Q: Okay. And you're saying that you did that because your hand hurt?

A: Correct.

*Id.* at PageID.216.

When Plaintiff pulled up his right hand, Holt immediately grabbed it and brought it back behind Plaintiff's back. Dashcam Video, ECF No. 21-2 at 9:39. Paetz exited the patrol car to provide Holt additional support. ECF No. 23-4 at PageID.287. Plaintiff told Holt "I'm not trying to do nothing." Video at 9:42. Holt and Plaintiff spoke to each other for a few more seconds, but the words are indecipherable in the video. Paetz entered the frame of the video as Plaintiff repeated, "I'm not trying to do nothing." At almost the same moment, Holt forced Plaintiff's torso towards the hood of the patrol car. Video 9:50. Plaintiff's face hit a small sign standing upright on the hood of the patrol car that read "STOP." Plaintiff yelled "Shit!" and his torso made impact with the hood of the patrol car. *Id.*

At this point, both Holt and Paetz were physically touching Plaintiff. Video at 9:51. Plaintiff was struggling and attempted to bring his left hand from behind his back. Video at 9:52. Paetz grabbed his hand and returned it behind Plaintiff's back. Video at 9:53. Plaintiff continued to repeat the phrase "I'm not trying to do nothing." He continued to struggle against the officers and said, "You're hurting my finger." Video at 9:58. The parties struggled for a few more seconds until they all stopped moving and Holt clearly told Plaintiff, "Okay, don't move. Do you understand? Do not move. Don't move." Video at 9:59. Paetz told Plaintiff, "I'm going to give you one more opportunity to not move." Video at 10:00. Rather than complying with the officers' directions, Plaintiff attempted to stand up from the hood of the patrol car while stating, "You're hurting my finger man."

Using his left hand, Paetz grabbed a pair of handcuffs from his belt and brought them behind Plaintiff's back. He maintained his right hand behind Plaintiff's back and Holt had both of his hands behind Plaintiff's back. Video at 10:06. Plaintiff continued to state, "You're hurting my fingers" and repeatedly attempted to stand up from the hood of the patrol car. Holt forced Plaintiff back down onto the hood of the patrol car while continuing to keep his hands behind Plaintiff's back. Video at 10:08. Plaintiff continued to struggle. Holt then reached behind Plaintiff's neck and pulled Plaintiff's head down and to the side onto the hood of the patrol car. Video at 10:10. When Plaintiff's head made impact with the hood of the patrol car, Holt placed his bicep on the left side of Plaintiff's neck and pulled Plaintiff to the ground. Video at 10:12.

Holt's body hit the ground first. ECF No. 23-3 at PageID.251. Holt's deposition testimony provides:

> So when Trooper Paetz and I had taken him to the ground we had released his arms. I had released his arms and Trooper Paetz had released his arm so his arms are now free again, so when he falls to the ground he's on top of his hands.

ECF No. 23-3 at PageID.252. According to Holt, Plaintiff was on his stomach with his fists balled near his shoulders and chest. *Id.* Holt was positioned on the right side of Plaintiff and Paetz was positioned on the left side of Plaintiff. *Id.* Holt testified that Plaintiff "was attempting to move his hands from underneath his body towards his face pushing up off the ground in like a push-up motion." *Id.* Defendants continued to attempt to constrain Plaintiff and tell him to put his hands behind his back. In the video, Plaintiff can be heard saying, "You broke my glasses man, you broke my glasses…I'm trying to get up sir, I'm trying to get up." Video at 10:33. One of the officers stated, "You're not getting off the ground." Video at 10:42.

Holt testified

> At this point we're very -- we're already exhausted, right? We've taken him down. We've tussled with him a little bit in front of the car. We're on the ground. I'm

trying to pry his arms out from underneath him, and he's trying to get up and he's telling us he's trying to get up. When he continues to try to get up I'm getting exhausted by -- I mean, I'm using all my strength to get his arms out from underneath his body and I can't…

Trooper Paetz is trying to get his left arm out, and we're trying to hold him down because he's now trying to get up. He's pushing up off the ground. And Trooper Paetz, you know, he says I'm going to, and I think he's talking to me, he catches his breath and then says I'm going to…and then he starts delivering body blows.

ECF No. 23-3 at PageID.253.

Paetz then delivered approximately 10-13 physical strikes to the left side of Plaintiff's body. ECF No. 23-3 at PageID.254. Paetz's hand can be seen in the bottom left corner of the video frame as he makes each strike. One of the officers yelled, "Put your hands behind your back. Put your hands behind your, you're not putting your hands behind your back!" As Paetz was striking Plaintiff, Plaintiff asked, "Why are you doing this?" Video at 11:03. Plaintiff then said, "I'm trying to get up right now" to which one of the officers responded, "You are not getting up." Video at 11:07. Plaintiff then made a comment about his finger and said, "Please, please sir." Video at 11:10.

Holt's deposition provides:

A: Most forcibles that I've been involved in don't last this long. Trooper Paetz and I are now both extremely winded, all right, and it becomes very scary as a police officer when you become exhausted. We've resorted to physical controls, which at that point I think Trooper Paetz delivered, you know, 10 to 13, I think is what I said, strikes to his body, which were rendered completely ineffective. He's still trying to get up and we have zero control over him on the ground, so at that point we resorted to a taser, which would be applicable in the force continuum.

Q: So you -- you indicated that this was a scary situation for you because you were winded?

A: Very much so, yes.

Q: Okay.

A: I've never been in a forcible situation this long in my entire career.

>Q: How long had you been an officer with the Michigan State Police at this point?
>
>A: Just under four years…

ECF No. 23-3 at PageID.255.

One of the officers can be heard yelling, "You're gonna get tased, do you wanna get fuckin' tased? You're about to have it happen." Video at 11:18. Plaintiff's response is undecipherable on the video. The officer then said "You're gettin' fuckin' tased." Video at 11:28. Plaintiff responded, "I wanna get up" and the officer said, "You're gonna get tased, do you understand?" Video at 11:30. Plaintiff repeated, "I wanna get up." Video at 11:31. One of the officers then tased Plaintiff as Plaintiff stated, "Sir, I'm tryin' to get up." Video at 11:36. One of the officers can be heard saying

>Put your hands behind your back, sir. Put your fuckin' hand behind your back. You're not putting your hands behind your back! Put your fuckin' hand behind your back! Put your hands behind your back!

Video at 11:44. The taser was ineffective and Plaintiff continued to attempt to stand. Holt's testimony provides:

>A. [S]o after we had delivered the taser and it was basically rendered completely ineffective, again Trooper Paetz and I are extremely winded at this time. We are now in fear that this could now escalate to a worse situation than it is already.
>
>Q. You were really scared of my client at this point?
>
>A. Absolutely, yeah, he's actively resisting, and like I reiterated, I've never been on the ground with somebody longer than this.
>
>Q. Well, we've already determined he didn't have any weapons in his possession?
>
>A. That doesn't mean someone is not dangerous.

ECF No. 23-3 at PageID.257. Paetz testified:

>A. Honestly I -- to be honest I was so shocked at how voraciously he had fought two state troopers, two well fit uniformed solid state troopers to the point where he

was able to overpower both of us at the same time. He was able to sustain my impacts with my fists, which phased him not whatsoever. I've never seen somebody undergo a taser strike and a subsequent dry stung [sic] with no effect whatsoever.

Q. Okay, so, sir, it's your testimony that Mr. Guerra overpowered you and your partner?

A. He was indeed.

Q. He did overpower you and your partner?

A. He was. We were not able to gain control of him.

ECF No. 23-4 at PageID.301. Paetz further testified:

A: He's actively resisting arrest. I mean, in this instance starting from beginning to finish I've never exerted myself more physically to take someone into custody. I was never -- neither of us were ever able to gain control over Mr. Guerra's hands. I witnessed him take my straight punches. I witnessed a complete taser, both strobes and dry stun, prove to be completely ineffective. Mr. Guerra had made and continued to hold a base, which was the propping up of the hands and the trying to get up, which in and of itself is an aggressive technique.

Q: Okay. Well, actively resisted, is that right?

A: He did.

Q: And because he actively resisted that constituted a threat; is that your testimony?

A: Absolutely does, yes.

ECF No. 23-4 PageID.304.

Holt continued to attempt to pull Plaintiff's hands behind his back. Paetz then delivered approximately 5 fist straight punches and 5 elbow strikes to the side of Plaintiff's face. ECF No. 23-3 at PageID.257-258. Plaintiff was rendered unconscious for approximately one and a half to two minutes. ECF No. 23-4 at PageID.292.

Medical personnel arrived shortly to tend to Plaintiff after which Plaintiff was placed in the patrol car. The Defendants smelled intoxicants and performed a preliminary breath test. ECF

No. 23-3 at PageID.265. It showed a result of 0.075. *Id.* Defendants did not administer any sobriety tests nor did they take a sample of Plaintiff's blood to check for the presence of drugs.

Defendants drove Plaintiff to the police station where Plaintiff was charged with resisting and obstructing a police officer. ECF No. 23-6. Plaintiff pled nolo contendere to a charge of attempted resisting and obstructing. ECF No. 23-7.

## II.

Now before the Court is Defendants' motions for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.

Defendants seeks summary judgment on Plaintiff's claims. A plaintiff proceeding under Section 1983 must establish at least a genuine issue of fact on the question of whether a person acting under color of state law deprived him of a right secured by the Constitution or by federal law. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The plaintiff must also demonstrate that the defendants are not entitled to qualified immunity. Qualified immunity is "an immunity

from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, (1985). The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The existence of qualified immunity turns on the question of whether a defendant's action violated clearly established law. *Id*. at 243–44. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id*. at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614, (1999). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Court has discretion regarding the sequence with which to conduct the analysis. *Pearson*, 555 U.S. at 236. Thus, the Court may hold that a right is not clearly established law without first analyzing whether the relevant facts actually establish a constitutional violation. *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). The relevant inquiry is whether "it would be clear to a reasonable officer

that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

## A.

When an excessive force claim arises, as here, "in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Fourth Amendment guarantees citizens the right to be free from "unreasonable" seizures, and thus the inquiry in excessive force cases under the Fourth Amendment turns on whether the seizure was reasonable. *Id.* at 394–96. In determining whether a seizure was reasonable, the court must carefully balance the individual's Fourth Amendment interests against the "countervailing governmental interests at stake." *Id.* at 396. Relevant factors include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Courts must look to the totality of the circumstances, but must view the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Importantly, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* In other words, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Rather, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. There is thus "a built-

in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

### 1.

To begin, Plaintiff does not appear to contend that his arrest was unlawful, simply that the force used in accomplishing the arrest was unconstitutional. ECF No. 28 at PageID.766 ("One warrant was valid because Plaintiff violated probation in Saginaw County when he walked away from a drug rehabilitation center."). Accordingly, the issue to be decided is narrow: whether the force used during the lawful arrest of Plaintiff was reasonable. For several reasons, it was.

The Sixth Circuit has held that officers may use force to "neutralize a perceived threat" while arresting an individual. *Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008). In *Wells v. City of Dearborn Heights*, the plaintiff was kneed to the ground by the officer because of "Wells's apparent failure to drop to the ground quickly enough." 538 F. App'x 631, 637 (6th Cir. 2013). The *Wells* Court noted that Wells had cerebral palsy and reached for a seat while trying to kneel, but concluded that a reasonable officer could have interpreted "Wells's failure to respond immediately . . . as his resisting arrest." *Id.* Similarly, in *Bolden v. City of Euclid*, the officer believed that plaintiffs were trespassing on private property and ordered them to get on the ground. 595 F. App'x 464, 466 (6th Cir. 2014). One of the plaintiffs started to walk away and pulled out a cell phone. *Id.* In response, the officer smacked the phone out of the plaintiff's hand and threw the plaintiff to the ground, forcibly holding him down. *Id.* The *Bolden* Court rejected the excessive force claim, explaining that the plaintiff's "refusal to comply with Officer Doyle's lawful commands justified the use of some force to control the situation." *Id.* at 470–71.

As stated above, the case authority focuses on several factors when analyzing the reasonableness of forced used while effectuating an arrest: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Importantly, courts must look to the totality of the circumstances, but must view the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Even construing the facts in a light most favorable to Plaintiff, there is no genuine issue of fact as to the reasonableness of the force used. Although the crime at issue is minor, Plaintiff repeatedly failed to comply with to the officers' directions, prompting the officers to incrementally escalate their use of force.

The officers held Plaintiff's hands behind his back. Holt asked Plaintiff to interlace his fingers and waited for Plaintiff to follow this direction. When Plaintiff failed to do so, Holt gave him clarifying instructions and waited again for Plaintiff to interlace his fingers. Plaintiff then brought his hand forward and Holt immediately returned Plaintiff's hand behind his back and instructed Plaintiff to keep his hands behind his back. Plaintiff continued to refuse to interlace his fingers so Holt forced him onto the hood of the patrol car.

The officers told Plaintiff multiple times to not move, but he continued to struggle, eventually trying to stand up from the hood of the patrol car despite the officers' directions to the contrary. In response, Holt pulled him to the ground.[3] The officers continued to instruct Plaintiff to put his hands behind his back. Instead of complying, Plaintiff repeatedly attempted to get to his feet. Paetz eventually delivered 10-13 blows to his body. Undeterred, Plaintiff continued to attempt

---

[3] Though this took the parties out of the frame of the dashcam, the parties' statements heard in the video's audio and the officers' deposition testimony corroborate that Plaintiff continued to resist arrest while on the ground.

to rise. This prompted the officers to tase him. Plaintiff continued to attempt to rise despite the tasing. Eventually, Paetz delivered blows to Plaintiff's head, rendering Plaintiff unconscious.

Plaintiff had multiple opportunities to comply with the officer's directions. Though his hand may have been injured, this did not prevent him from keeping his hands behind his back and explaining his injury to the officers. Plaintiff held his hands behind his back for almost 20 seconds with no apparent difficulty as he and Holt initially discussed interlacing his fingers. Importantly, Plaintiff may have been unable to interlace his fingers, but there is no indication that he was unable to keep his hands behind his back or to stop struggling against the officers.

Plaintiff escalated the situation by repeatedly attempting to draw his hands from behind his back. The officers' actions were responsive, not provocative. Each time the officers increased their use of force, it was reasonably related to the threat posed by Plaintiff. Like in *Dunn*, *Wells*, and *Bolden*, a reasonable officer could reasonably have interpreted Plaintiff's actions as attempts to resist arrest. When dealing with a noncooperative suspect, officers may neutralize the threat while handcuffing the suspect by pushing him over a car, into a wall, or onto the ground.

**2.**

Plaintiff argues that Holt should have used a different handcuffing method that would not have required him to interlace his fingers. ECF No. 28 at PageID.767-768. Hindsight analysis, however, is not warranted. On the contrary, the situation is to be evaluated "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. Here, Holt testified that interlacing fingers was the best method for handcuffing an individual. Though in Plaintiff's unique situation it may have been better for Holt to use a different method, the after-the-fact critique is not required by existing authority.

Plaintiff further argues that Defendants violated his Fourth Amendment rights because they used deadly force against him. ECF No. 28 at PageID.782-783. However, the proper inquiry is not whether Defendants used deadly force, but instead, whether Defendants acted reasonably. The Supreme Court in *Tennessee v. Garner*, 471 U.S. 1 (1985) addressed the use of deadly force and later explained the holding as follows:

> *Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute "deadly force." The Court there simply applied the Fourth Amendment's "reasonableness" test to the use of a particular type of force in a particular situation. That case has scant applicability to this one, which has vastly different facts. Whether or not Scott's actions constituted "deadly force," what matters is whether those actions were reasonable.

*Scott v. Harris* 550 U.S. 372, 372 (2007). So too here. Defendants acted reasonably given the facts they faced. Plaintiff was resisting arrest. Defendants increased their level of force to respond to the circumstances accordingly. Plaintiff provides a list of Sixth Circuit cases regarding the use of deadly force. However, all the cases stand for the proposition that deadly force may not be used when the individual is subdued or compliant. Here, Plaintiff was not subdued nor compliant, but instead resisting arrest.

**B.**

Because the force used was reasonable under the circumstances, there was no constitutional violation. For that reason, summary judgment will be granted for Defendants on the excessive force issue. But even if the Court concluded that a constitutional violation had occurred, Defendants would be protected by qualified immunity. Given the similar facts in *Dunn*, *Wells*, and *Bolden*, the unreasonableness of the force used was not clearly established at the time the arrest occurred.

**IV.**

Count III of Plaintiff's complaint presents a claim of assault and battery under state law. Supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966). "Supplemental jurisdiction is governed by 28 U.S.C. §1367, which includes an explicit provision permitting the district court to decline to exercise supplemental jurisdiction when that court has dismissed all of the claims over which it has original jurisdiction." *Weeks v. Portage County Executive Offices*, 235 F.3d 275, 280 (6th Cir. 2000); *Moon v. Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006); *see also Washington v. Starke*, 855 F.2d 346, 351 (6th Cir. 1998); *Perry v. Se. Boll Weevil Eradication Found.*, 154 F. App'x 467, 478 (6th Cir. 2005).

Count III of Plaintiff's complaint is brought solely pursuant to Michigan assault and battery law. Defendants contend that as government employees, they are entitled to qualified immunity from intentional tort liability. ECF No. 23 at PageID.181-186. The test for determining qualified immunity under state law differs from the test for determining qualified immunity under federal law. Because Plaintiff's federal claim will be dismissed, Count III of Plaintiff's complaint will also be dismissed to avoid unnecessarily addressing a state law question when the Court no longer has original jurisdiction over the complaint.

### V.

Defendants also filed a motion to exclude the testimony of Plaintiff's expert witness, Andrew J. Scott III. ECF No. 21. Mr. Scott worked in local law enforcement in Florida for almost thirty years and is currently a candidate for a doctorate in criminal justice from Saint Leo University in Sant Leo, Florida. ECF No. 24-5. In preparation for this case, Mr. Scott prepared a ten-page report containing various conclusions that he reached after viewing the dashcam video and accompanying law enforcement reports. *Id.* Mr. Scott also gave a deposition. ECF No. 21-4.

Defendants' motion will be denied as moot because Plaintiff's complaint will be dismissed. Even if the Court were to consider Mr. Scott's report, it does not change the analysis. In his response brief, Plaintiff quotes Mr. Scott's conclusion from the video that, "There is no indication from any of these officers that Mr. Guerra is getting ready to bolt, and if they were, they would have been right next to him." ECF No. 28 at PageID.766. Regardless of what the officers thought about Plaintiff's likelihood of fleeing, Plaintiff subsequently resisted arrest, justifying Defendants' use of force against him.

In referencing Plaintiff's arrest warrants, Plaintiff represented that "Plaintiff's expert will testify that these were not serious crimes." ECF No. 28 at PageID.767. Though the seriousness of the crime is a relevant factor to consider, it does not dispel the fact that Plaintiff resisted arrest throughout the encounter. As explained above, Defendants' use of force was reasonable. Plaintiff also quotes Mr. Scott's report in which he stated that "Striking an individual in the head is tantamount to using deadly force." ECF No. 28 at PageID.779. However, as explained above, the relevant inquiry is whether the force was reasonable.

## VI.

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment, ECF No. 23, is **GRANTED**.

It is further **ORDERED** that Count I of Plaintiff's complaint is **DISMISSED with prejudice**.

It is further **ORDERED** that the Court declines to exercise supplemental jurisdiction over the state law claim contained in Count III of Plaintiff's complaint. Count III is **DISMISSED without prejudice**.[4]

It is further **ORDERED** that Defendants' motion to exclude Plaintiff's expert witness, ECF No. 21, is **DENIED AS MOOT**.

It is further **ORDERED** that the parties' motions in limine, ECF Nos. 35-38, are **DENIED AS MOOT**.

Dated: December 18, 2019					s/Thomas L. Ludington
							THOMAS L. LUDINGTON
							United States District Judge

---

[4] Count II of Plaintiff's complaint only brought claims against the Michigan State Police. The Michigan State Police was previously dismissed by stipulation of the parties. Accordingly, Count II has already been dismissed. ECF No. 11.